IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

**UNITED STATES OF AMERICA,**

      Plaintiff,

v.

**SALUSTIO FLORES-ROJAS,**

      Defendant.

No. 1:17-cr-00296-AA

**OPINION & ORDER**

AIKEN, District Judge.

This case comes before the Court on Defendant Salustio Flores-Rojas' Motion to Dismiss the Indictment. ECF No. 44. For the reasons set forth below, the Motion is DENIED.

## BACKGROUND

On August 3, 2017, Defendant was charged by indictment with Illegal Reentry in violation of 8 U.S.C. § 1326. ECF No. 1. On May 29, 2018, Defendant pleaded guilty to the offense. ECF No. 25. Defendant absconded prior to his sentencing hearing. ECF No. 33. He was subsequently arrested and charged with a pretrial release violation in August 2021. ECF Nos. 34, 35.

## DISCUSSION

Defendant moves to dismiss the indictment on the basis that 8 U.S.C. § 1326 violates the Fifth Amendment guarantees of equal protection in that the statute, though facially neutral, has a discriminatory purpose and a disparate impact on a disfavored group. Section 1326 provides that "any alien who . . . has been denied admission, excluded, deported or removed" from the United

States and, without permission, later "enters, attempts to enter, or is at any time found in, the United States" shall be imprisoned for up to two years. 8 U.S.C. § 1326(a).

Defendant's motion replies primarily on the rationale outlined by the district court in *United States v. Carillo-Lopez*, 555 F. Supp.3d 996 (D. Nev. 2021), *rev'd and remanded*, ___F.4th___, No. 21-10233, 2023 WL 3587596 (9th Cir. 2023). The district court decision has recently been reversed and the Ninth Circuit issued an emphatic rejection of its underlying rationale. This Court follows, as it must, the Ninth Circuit's decision in *United States v. Carillo-Lopez*, ___F.4th___, No. 21-10233, 2023 WL 3587596 (9th Cir. May 22, 2023).

Here, Defendant argues that the immigration legislation passed by Congress in the 1920s was motivated by discriminatory animus toward people from Latin America. In *Carillo-Lopez*, the Ninth Circuit held that even if a precursor of 8 U.S.C. § 1326 was enacted with invidious intent, when taken with the "strong 'presumption of good faith' on the part of legislators" in enacting current legislation, "[p]ast discrimination cannot, in the manner of original sin, condemn [subsequent] governmental action that is not itself unlawful." *Carillo*, 2023 WL 3587596, at *4 (internal quotation marks and citation omitted). The question therefore remains whether subsequent enactments violate the Fifth Amendment and in *Carillo* the Ninth Circuit determined that they do not.

The Ninth Circuit has held that § 1326 is facially neutral as to race, *Carillo*, 2023 WL 3587596 at *6, and Defendant does not argue otherwise. Defendant presents his challenge as one brought under *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977). A statute that is facially neutral may also violate equal protection principles, but only if a discriminatory purpose was a motivating factor for the legislation. *Arlington Heights*, 429 U.S. at 265-66.

> Whenever a challenger claims that a law was enacted with discriminatory intent, the burden of proof lies with the challenger. To establish that the lawmakers had a discriminatory purpose in enacting specific legislation, it not enough to show that the lawmakers had an awareness of the consequences of the legislation for the affected group, that those consequences were foreseeable, or that the legislature acted with indifference to the effect on that group. Rather, the lawmaking body must have selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group. Therefore, the plaintiff must prove by an evidentiary preponderance that racial discrimination was a substantial or motivating factor in enacting the challenged provision.

*Carillo*, 2023 WL 3587596, at *3 (internal quotation marks and citations omitted, alterations normalized).

"The most important evidence of legislative intent is the historical evidence relating to the enactment at issue," and courts consider such factors as (1) the historical background of the decision; (2) the specific sequence of events leading up to the challenged decision; (3) departures from the normal procedural sequence; (4) substantive departures; and (5) legislative or administrative history. *Carillo*, 2023 WL 3587596, at *4 (internal quotation marks and citation omitted). This evidence is considered "in light of the strong presumption of good faith on the part of legislators." *Id.*

"In addition to historical evidence relating to the enactment at issue, courts may consider evidence that the legislation at issue has a disproportionate impact on an identifiable group of persons." *Carillo*, 2023 WL 3587596, at *5. However, evidence of disproportionate impact "is generally not dispositive, and there must be other evidence of a discriminatory purpose." *Id.* (internal quotation marks and citation omitted). "A court may not infer a discriminatory motive based solely on evidence of a disproportionate impact except in rare cases where a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action," and "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value." *Id.* (internal quotation marks and citations omitted).

If the challenger satisfies the burden of demonstrating a discriminatory purpose was a motivating factor, the burden shifts to the government to show that the same decision would have resulted even had the impermissible purpose not been considered. *Carillo*, 2023 WL 3587596, at *5. If the government carries this burden, there is no equal protection violation. *Id.* If the challenger succeeds in carrying his burden and the government would not have enacted the same legislation without such motivation, then the enactment violates equal protection principles unless the government has a compelling reason for enacting it. *Id.*

Although the Ninth Circuit declined to determine whether the test outlined in *Arlington Heights* applies to immigration laws, the court determined that even when applying those standards to § 1326, the defendant's equal protection challenge failed. *Carillo*, 2023 WL 3587596, at *5.

The Ninth Circuit found that in formulating the Immigration and Nationality Act, the Senate spent three years conducting "a most intensive and searching investigation" requiring the subcommittee to examine reports and statistical data, officials and employees, and to make field investigations "throughout Europe and the United States, as well as at the Mexican border, in Canadian border cities, and in Havana, Cuba." *Carillo*, 2023 WL 3587596, at *6. The committee reviewed rules, regulations, treaties, Executive Orders, and legislative enactments to draft an omnibus bill embodying the entirety of US immigration and naturalization laws. *Id.* This resulted in a 925-page Senate Report addressing "each population group" in the Americas. *Id.* at *6-7.

While considering the repeal of the then-current immigration laws and the enactment of a new immigration and naturalization scheme, the Senate held hearings and debates indicating "Congress was deeply concerned with many facets of the [INA] but §§ 1325 and 1326 were not among the debated sections." *Id.* at *7-9. "There was no discussion of Section 276's impact on Mexicans or other Central and South Americans." *Id.* at *9. President Truman vetoed the bill,

expressing concern that the bill favored immigrants from England, Ireland, and Germany over those from Southern and Eastern Europe.  *Id.*  President Truman did not mention Mexican citizens or citizens from Central and South America or the provision criminalizing reentry.  *Id.*

The Ninth Circuit found that Congress was not motivated to discriminate against people coming from Mexico, Central, and South America in enacting the INA.  *Carillo*, 2023 WL 3587596, at *10.  The court found no language denigrating Latino immigrants in the Senate report and no evidence that the fact that Congress overrode the presidential veto demonstrated discriminatory animus.  *Id.*  Nor did the use of the term "wetback" in a Justice Department letter to Congress demonstrate discriminatory intent by Congress.  *Id.* at *11.  The *Carillo* court also found "the INA was not a 'reenactment' of the 1929 Act, but rather a broad reformulation of the nation's immigration laws, which included a recommendation 'that the time ha[d] come to erase from our statute books any discrimination against a person desiring to immigrate to this country or to become a naturalized citizen, if such discrimination [was] based solely on race.'"  *Id.* at *12.  The court noted that from the time Congress passed the Undesirable Aliens Act of 1929, there was a 96% turnover in the membership of Congress.  *Id.*  Two members participated in the debates for both Acts and both spoke of maintaining "homogeneity" and keeping "undesirables" out of the country, but the Ninth Circuit held that the statements of those two members "which in any event were made in the context of debating the national-origin quota system rather than in discussing § 1326, are not probative of the intent of the legislature as a whole."  *Id.*

Finally, the Ninth Circuit rejected the argument that there was sufficient evidence of a disparate impact on people coming from Mexico, Central, and South America to demonstrate discriminatory intent.  *Carillo*, 2023 WL 3587596, at *13.  The court observed that although "99% of prosecutions for illegal reentry are against Mexican or Central and South American defendants

. . . This data has little probative value, however, because it relates to a period that is more than 45 years after the INA was enacted. After such a long passage of time, this information does not raise the inference that Congress enacted § 1326 in 1952 because of its impact on Mexicans and other Central and South Americans." *Id.* In addition, the court noted that the proximity of Mexico and the size of the U.S.-Mexico border provides a "clear geographic reason for disproportionate impact on Mexicans and other Central and South Americans [which] undermines any inference of discriminatory motive." *Id.* at *14. People coming to the U.S. from Mexico, Central, and South America "make up a large share of the unauthorized alien population" and, consequently, they make up a large share of those being removed from the U.S. *Id.* As a result, "the fact that § 1326, which criminalizes reentry, has a greater impact on the individuals who share a border with the United States, and make up a large share of the unauthorized alien population, than those who do not, does not prove that penalizing such individuals was the purpose of this legislation." *Id.* (internal quotation marks and citation omitted).

As a result, the Ninth Circuit conclusively rejected the defendants' equal protection argument and reversed the contrary holding of the district court. *Carillo*, 2023 WL 3587596, at *14. Following that guidance, this Court likewise DENIES Defendant's Motion to Dismiss the Indictment, ECF No. 44.

It is so ORDERED and DATED this <u>5th</u> day of June 2023

 /s/Ann Aiken
ANN AIKEN
United States District Judge
